### SOUTH UTAH MINES & SMELTERS v. UTAH LEASING CO.

(Circuit Court of Appeals, Eighth Circuit. May 13, 1919.)

No. 5092.

1. WATERS AND WATER COURSES ⊕285—CONTRACT TO SUPPLY WATER—MINING PURPOSES.

Under contract whereby mining company agreed to furnish water to plaintiff engaged in extracting metal from copper tailings or refuse, *held*, plaintiff was limited to a maximum of 200 gallons per minute, and was not entitled to all water reasonably necessary for the operation of its plant.

2. CONTRACTS ⊕143—CONSTRUCTION—POWER OF COURT.

The court cannot by implication add to or change a contract which is clear and complete in itself.

Appeal from the District Court of the United States for the District of Utah; Tillman D. Johnson, Judge.

Bill by the Utah Leasing Company against the South Utah Mines & Smelters. Decree for complainant, and defendant appeals. Reversed, with instructions.

---

⊕For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Charles C. Parsons, of Salt Lake City, Utah, for appellant.

Edward B. Critchlow, of Salt Lake City, Utah (William J. Barrette, of Salt Lake City, Utah, and George A. Critchlow, of New York City, on the brief), for appellee.

Before SANBORN, CARLAND, and STONE, Circuit Judges.

STONE, Circuit Judge. The appellant in 1914, and for some years prior thereto, was operating a copper mine and concentrator. The crude ore was concentrated by use of a large volume of water owned and brought by it a distance of 8 or 9 miles through a steel-riveted pipe which, through long usage, was subject to breaks, and required care to keep it repaired and up to its capacity of 800 gallons per minute. The mill was incapable of extracting all the metal from the ore, and this unextracted metal was left in the tailings or refuse, which was collected in a huge dump. The appellee was engaged in the business of extracting metal from refuse of this character. With a view to mutual profit, the parties entered into a contract under which appellee was to establish a mill near that of appellant and work over this heap of tailings. A necessary medium in the operations of appellee was water. The contract, therefore, provided for the use by it of some of this water belonging to appellant. Shortly after the contract became operative, appellant shut down its mill, but continued to permit usage of water by appellee for its milling plant. Subsequently disputes arose between the parties as to the amount of water so used by appellee. Appellant claimed that the contract limited appellee's use to 200 gallons per minute, and that it was using far more and should pay for the excess. Appellee admitted it was using much more than that quantity, but claimed that the contract gave it the right to use as much as was reasonably necessary for the operation of its plant. Upon appellant threatening to cut off or limit the water supply, appellee brought its bill, praying that appellant be enjoined from interfering with, limiting, or diverting from it such supply of water as it reasonably needed for operation, which amount it then estimated at 600 gallons per minute. After hearing, the trial court enjoined the appellant from preventing the appellee from securing and using such volume of water as reasonably necessary to its operations, not exceeding 600 gallons per minute. From this decree the appeal comes here.

[1] The contract is written, and there is no dispute that the amount of water used by appellee is far in excess of 200 gallons per minute. The difference is therefore purely one as to the meaning of the contract. Does it limit the appellee to a maximum of 200 gallons per minute, or does it permit the use of all reasonably necessary to the operation of its plant? The entire expression of the contract as to water usage is as follows:

"Second. The Mining Company agrees to furnish to the Leasing Company, free of cost, fresh water sufficient for its needs, but not to exceed at any time a rate of sixty (60) gallons per minute, except as hereinafter provided. The water to be piped from the pipe lines of the Mining Company's mill at the expense of the Leasing Company. If, however, the operations of the Mining.

Company shall be, at any time while this agreement is in force, suspended in its mine and mill the necessary repairs and running expenses in the keeping up of all repairs on the pipe line across the valley to the aforesaid plant of the Leasing Company shall be borne by said last-named company. The Mining Company agrees to furnish water in addition to the sixty gallons up to a total of two hundred (200) gallons per minute, to said Leasing Company, if in the opinion of the Mining Company this can be done without affecting its operations. The Mining Company also agrees to allow, during its milling operations, the Leasing Company to recover from the tailrace and slimes leaving the Mining Company's mill such amount of water as it, the Leasing Company, is able to recover without affecting the operations of the Mining Company."

It would be difficult to select language which would more clearly and certainly express an intention to limit the maximum fresh water usage to 200 gallons per minute. Appellee seeks to avoid this language by saying that—

"It did not, nor does the contract in any other provision purport to deal with the situation which might arise and which afterwards did arise, to wit, the shutting down of the mine and mill of appellant."

It then asks this court to supply that deficiency by an implication that the parties had in mind at the time the contract was made, and intended as a part thereof, that if the appellant closed down its mill it should permit the appellee to use all of the fresh water it might need beyond 200 gallons.

[2] However much a court may be tempted to do so, it cannot by implication add to or change a contract which is clear and complete within itself. This very clause of the contract shows that the parties had in mind, in connection with the water supply, that the appellant might close its mill. It provides, in such a contingency, for the upkeep of the pipe line by the appellee. When this very contingency was in the minds of the parties when they drew the contract, and when the care with which this clause and the entire contract was drawn is noticeable, what room is there to say that the parties intended to leave to implication and uncertainty the volume of water to be then used? To our minds, the reasonable view is that the parties intended to and did define that quantity in express terms. The argument of counsel is ingenious, but seems to us unsound.

The judgment is reversed, with instructions to dismiss the bill upon the merits, at the cost of appellee.